UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK COLWELL, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

        v.

EXICURE, INC., DAVID A. GILJOHANN,
BRIAN C. BOCK, and GRANT T. CORBETT,

        Defendants.

Case No. 1:21-CV-06637

Honorable John F. Kness

**DECLARATION OF EVAN A. KUBOTA IN SUPPORT OF:
(I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF PROPOSED
CLASS ACTION SETTLEMENT AND (II) LEAD COUNSEL'S MOTION
FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND
<u>LEAD PLAINTIFF'S REASONABLE COSTS AND EXPENSES</u>**

**TABLE OF CONTENTS**

I.    LEAD PLAINTIFF'S PROSECUTION OF THE ACTION ............................................... 2

    A.    Commencement of the Action and Appointment of Lead Plaintiff ......................... 2

    B.    Lead Plaintiff's Investigation and Filing of the
         Second Amended Complaint ................................................................................. 3

    C.    Mediation with Jed Melnick ................................................................................. 7

    D.    The Stipulation of Settlement and Lead Plaintiff's Motion for
         Preliminary Approval .......................................................................................... 9

    E.    Notice, Claims, and Settlement Fund Administration .......................................... 9

II.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES,
     LITIGATION EXPENSES, AND REASONABLE COSTS AND
     EXPENSES TO LEAD PLAINTIFF ................................................................................ 10

    A.    Fee Application ................................................................................................... 11

         1.    The Time and Labor Expended ................................................................ 11

         2.    The Novelty and Difficulty of the Questions Presented by the
            Litigation and Counsel's Skills in Representing the Class ....................... 13

         3.    The Result Achieved for the Class ........................................................... 14

         4.    The Risk of Nonpayment and Contingent Nature of Counsel's Fee ........ 14

         5.    The Experience, Reputation, and Ability of Counsel .............................. 15

         6.    The Reaction of the Lead Plaintiff and Class Supports the
            Fee Application ....................................................................................... 16

    B.    Expense Application ........................................................................................... 17

         1.    BFA's Litigation Expenses ...................................................................... 17

         2.    Lead Plaintiff's Reasonable Costs and Expenses .................................... 18

i

EVAN A. KUBOTA declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1.    I am a partner at Bleichmar Fonti & Auld LLP ("Lead Counsel" or "BFA"), Court-appointed Lead Counsel in the above-captioned action (the "Action" or "Litigation").[1]

2.    I submit this declaration in support of (I) Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and (II) Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Lead Plaintiff's Reasonable Costs and Expenses.

3.    I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of the Action.

4.    Attached hereto are true and correct copies of the following documents:

a)    Exhibit A – The Declaration of Lead Plaintiff James Mathew in Support of: (I) Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and (II) Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Lead Plaintiff's Reasonable Costs and Expenses (the "Mathew Declaration").

b)    Exhibit B – A list of BFA attorneys and professional support staff who worked on the case, as well as information about each individual's qualifications, experience, and role.

c)    Exhibit C – A schedule summarizing the amount of time spent by each attorney and professional support staff employee of BFA from inception of the Litigation

---

[1] Capitalized terms not defined herein have the meanings stated in the Stipulation of Settlement (the "Stipulation," ECF 99).

through November 30, 2024, the rates applicable to each individual, and a lodestar calculation for each individual.

d) Exhibit D – BFA's firm resume.

e) Exhibit E – The Declaration of Morgan Kimball Regarding (I) Mailing of Notice; (II) Publication of Summary Notice; (III) the Settlement Website and Contact Center Services; (IV) Claim Filing; and (V) Requests for Exclusion and Objections Received to Date (the "Kimball Declaration" or "Kimball Decl.").

f) Exhibit F – The Declaration of Kyle S. Bingham on Implementation of CAFA Notice (the "Bingham Declaration" or "Bingham Decl.").

g) Exhibit G – A summary of BFA's expenses incurred in connection with Lead Plaintiff's prosecution of the Action.

h) Exhibit H – The Declaration of Jed Melnick of JAMS.

i) Exhibit I – The Declaration of Elizabeth A. Fegan in Support of Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Lead Plaintiff's Reasonable Costs and Expenses, Filed on Behalf of Fegan Scott LLC.

j) Exhibit J – The Declaration of Brian Schall in Support of Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Lead Plaintiff's Reasonable Costs and Expenses, Filed on Behalf of The Schall Law Firm.

# I.   LEAD PLAINTIFF'S PROSECUTION OF THE ACTION

## A.   Commencement of the Action and Appointment of Lead Plaintiff

5.   The initial complaint in this action was filed by Plaintiff Mark Colwell. (ECF No. 1.) The initial complaint alleged false and misleading statements in violation of

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants Exicure, David Giljohann, and Brian Bock.

6. On February 11, 2022, James Mathew moved for appointment as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B). (ECF No. 19.) Three other individuals also moved for appointment as lead plaintiff: Sam Uemura (ECF No. 13); Jeffrey Coleman (ECF No. 17); and Martin Gui (ECF No. 22). Coleman and Uemura withdrew their motions (ECF Nos. 35, 36).

7. On March 20, 2023, the Court appointed James Mathew as Lead Plaintiff and approved his selection of BFA as Lead Counsel. (ECF No. 55.) The Court found that Mathew has the largest financial interest; that "Mathew's claims are typical of the class's claims"; and that Mathew satisfies "the adequacy requirement." (*Id.* at 5, 10-11.) As to Mathew's selection of BFA as Lead Counsel, the Court noted that "Mathew represents that BFA has had extensive experience and success litigating securities class actions," including several "with recoveries into the hundreds of millions of dollars." (*Id.* at 11.)

8. After Lead Plaintiff and Lead Counsel's appointment, the parties conferred and submitted an agreed-upon proposed schedule for Lead Plaintiff to file a second amended complaint and for briefing on Defendants' anticipated motion to dismiss. (ECF No. 57.)

**B. Lead Plaintiff's Investigation and Filing of the Second Amended Complaint**

9. Immediately after Mr. Mathew was appointed Lead Plaintiff and BFA was appointed Lead Counsel, BFA commenced an extensive investigation.

3

10. As part of that investigation, BFA analyzed Exicure's U.S. Securities and Exchange Commission ("SEC") filings and Defendants' other public statements, including earnings calls and public presentations, as well as media reports, analyst reports, and historic stock data.

11. BFA (working with investigators) also conducted an extensive search to locate former Exicure employees with potentially relevant information. The Second Amended Complaint (the "SAC," ECF No. 61) ultimately incorporated information from three former Exicure employees: a Project Manager (FE-1), Research Associate II (FE-2), and Research and Development Manager (FE-3). (*Id.* ¶¶260-62.)

12. On May 26, 2023, Lead Plaintiff filed the SAC alleging violations of Sections 10(b) and 20(a) of the Exchange Act against Defendants Exicure, Giljohann, Bock, and Grant Corbett. (ECF No. 61.) Based on Plaintiff's Counsel's investigation, the SAC—which is 117 pages long, with 337 paragraphs—significantly expanded and bolstered the allegations of the initial 18-page, 56-paragraph complaint to maximize the value of the Class's claims.

13. For example, the SAC leveraged detailed scientific and technical information from three former Exicure employees that was critical to alleging falsity and scienter. FE-1 detailed Corbett's experiments on mice; explained how alleged data discrepancies quickly emerged when a contract research organization, Charles River, attempted to replicate Corbett's work; and described how CEO Giljohann participated in two conference calls with Charles River in September 2021 where the alleged discrepancies were discussed (*id.* ¶260). FE-1 also cited alleged deficiencies in Exicure's controls regarding data integrity, including the alleged lack of a "second body" to check Corbett's data (*id.*).

4

14.     FE-2 similarly described Exicure's alleged lack of oversight. (*Id.* ¶261.) FE-2 further detailed how frataxin levels were measured in the mice experiments (including the number and type of samples and the machine utilized), and how the resulting data was maintained in Exicure's systems and potentially manipulated by Corbett using specific software. (*Id.*)

15.     FE-3 shed light on Exicure's screening process to identify XCUR-FXN, including how Corbett allegedly used an unreliable assay to identify a sequence that moved into further testing in the XCUR-FN program, after which CEO Giljohann allegedly rewarded Corbett with a Lego set for high-level job performance. (*Id.* ¶262.)

16.     The SAC also incorporated new allegations that Exicure did not comply with FDA regulations that required a "separate" and "independent" person to "assure" that "the reported results accurately reflect the raw data" and that there were "no deviations from approved protocols or standard operating procedures" in its experiments. 21 C.F.R. § 58.35(a)-(b). (ECF No. 61 ¶20.)

17.     Importantly, the SAC significantly expanded the alleged misstatements. While the original complaint alleged only a handful of misstatements through August 12, 2021 (ECF No. 1 ¶¶17-20), the SAC expanded the depth and duration of alleged misstatements (ECF No. 61 ¶¶162-255), including Exicure's visual presentations of the allegedly manipulated results and alleged misstatements about Exicure's controls. And notably, the SAC alleged additional misstatements through November 2021 (*id.* ¶¶216-234, 253-55)—after Giljohann allegedly learned of the data discrepancies from his September 2021 calls with Charles River.

18.     Further, anticipating that Defendants would challenge the alleged misstatements as non-actionable opinions under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), the SAC included allegations that the misstatements were "not the

product of any honest error, interpretation, or opinion, much less a legitimate scientific methodology." (ECF No. 61 ¶78.) To bolster the point, the SAC alleged that Corbett's actions violated federal regulations that expressly bar "fabrication" and "falsification," such as "making up data or results," "changing or omitting data or results such that the research is not accurately represented," and "manipulating research materials, equipment, or processes," as distinct from "honest error or differences of opinion." 42 C.F.R. § 93.103. (ECF No. 61 ¶78.)

19. The SAC also bolstered the allegations of scienter. For example, the SAC leveraged Exicure's public statements about Corbett's conduct (*id.* ¶¶257-58); the information from Exicure former employees, including as to Defendants' access and exposure to real-time data and results (*id.* ¶¶259-66); the FDA data integrity regulations summarized above (*id.* ¶267); Defendant Giljohann's September 2021 calls with Charles River (*id.* ¶268); the core operations doctrine, given XCUR-FXN's status as Exicure's flagship drug (*id.* ¶¶269-71); Exicure's tenuous financial condition (*id.* ¶¶273-77); the volume and specificity of Defendants' public statements about XCUR-FXN (*id.* ¶¶278-83); Exicure's alleged lack of disclosure and data integrity controls, coupled with Defendants Giljohann and Bock's certifications about Exicure's "effective" controls (*id.* ¶¶283-87); executive terminations (*id.* ¶¶288-90); and corporate scienter (*id.* ¶¶295-97).

20. In addition, the SAC added Corbett himself as a Defendant, constraining Defendants' ability to argue that any alleged fraud occurred without their knowledge or participation. This also set the stage for Plaintiff's Counsel to obtain Corbett's cooperation to provide relevant facts, as previously described (ECF No. 98 at 14 of 20).

### C.    Mediation with Jed Melnick

21.    After filing the SAC, Plaintiff's Counsel recognized that Exicure's distressed and worsening financial condition counseled in favor of exploring a potential resolution.  For example, the SAC alleged that Exicure was "now an empty shell with only 13 employees and no ongoing research" (ECF No. 61 ¶28).  Exicure's Form 10-Q for the second quarter of 2023 (filed August 11, 2023) reported just $2.335 million in cash and cash equivalents, disclosing that "[o]ur current liquidity is not sufficient to fund operations over the next twelve months" and that "the Company may seek bankruptcy protection in the near term."[2]  In August 2023, the parties advised the Court that a voluntary private mediation was scheduled for November 15, 2023, and the Court stayed the Action pending further order (ECF No. 69).

22.    In December 2023, Defendants Exicure and Bock substituted counsel (ECF No. 71), and the mediation was delayed.  On December 6, 2023, the Court directed the parties to "file a joint status report by 12/22/2023 with a firm date of mediation or alternatively, a proposed schedule for continuing the litigation" (ECF No. 73).

23.    On December 22, 2023, the parties reported that a defense-only mediation session was scheduled for January 4, 2024, with a joint mediation session scheduled for March 4, 2024 (ECF No. 77).

24.    On March 4, 2024, counsel for Lead Plaintiff; counsel for Defendants Exicure, Giljohann, and Bock; and representatives of these Defendants' insurers participated in a full-day

---

[2]    Exicure Form 10-Q, dated Aug. 11, 2023, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001698530/000169853023000091/xcur-20230630.htm.

7

mediation with Jed Melnick of JAMS. Prior to the mediation conference, the parties exchanged confidential mediation statements and Mr. Melnick conferred separately with both sides.

25. During the March 4, 2024 mediation, the parties exchanged multiple offers and counteroffers under Mr. Melnick's auspices, but the parties were not able to independently reach a resolution, and the March 4, 2024 mediation ended without any agreement.

26. Over the next several months, the parties engaged in extensive discussions with Mr. Melnick and exchanged further offers and counteroffers, but again were unable to reach agreement.

27. On May 21, 2024, the parties reported that counsel for Lead Plaintiff and counsel for Defendants Exicure, Giljohann, and Bock had participated in the March 4, 2024 mediation session and subsequent discussions under the mediator's auspices (ECF No. 84). In the same report, the parties proposed a litigation schedule to further amend the SAC and brief any motions to dismiss (*id.*).

28. On July 19, 2024, the parties filed a joint status report explaining that mediation remained ongoing and proposing a revised schedule for the forthcoming Third Amended Complaint and motion to dismiss briefing, which the Court granted (ECF No. 91).

29. Finally, on July 24, 2024, Mr. Melnick made a formal mediator's proposal that the case settle for $5,625,000. On July 26, 2024, Plaintiff and Defendants Exicure, Giljohann, and Bock accepted the proposal, and on August 2, 2024, the parties advised the Court of the "proposed settlement, which remains subject to executing a term sheet that the parties are working to finalize." (ECF No. 92.)

8

30.     On August 7, 2024, the parties advised the Court of the executed term sheet (ECF No. 93), and, on August 12, 2024, clarified that the forthcoming class settlement will (if approved) resolve this litigation in its entirety, including as to Defendant Corbett (ECF No. 95).

**D.     The Stipulation of Settlement and Lead Plaintiff's Motion for Preliminary Approval**

31.     After reaching an agreement in principle, the parties engaged in several weeks of negotiations to prepare the Stipulation and its exhibits, including the Notice, Long-Form Notice, Proof of Claim, and Summary Notice, and developed the Plan of Allocation with expert assistance.

32.     All parties subsequently executed the Stipulation, and Lead Plaintiff filed the preliminary approval motion on September 6, 2024.  (ECF No. 97.)

33.     On September 13, 2024, Defendants served the notice required under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1715 (2005), *et seq*.  (*See* Ex. E (Bingham Decl.).)

34.     On October 8, 2024, the Court entered the Preliminary Approval Order. (ECF No. 103.)

**E.     Notice, Claims, and Settlement Fund Administration**

35.     At Lead Counsel's direction, immediately after the Preliminary Approval Order, the Court-appointed notice and claims administrator, Epiq Class Action and Claims Solutions, Inc. ("Epiq"), began implementing the Court-approved notice program.  Lead Counsel has received, and continues to receive, regular updates from Epiq on the status of the notice and claims process.

36.     On November 11, 2024, the Court-approved Summary Notice was published in *Investor's Business Weekly*, transmitted over *PR Newswire*, and published by the Depository Trust Corporation on the DTC Legal Notice System ("LENS").  (Ex. D (Kimball Decl.) ¶¶13-14.)  On the     morning     of     October     30,     2024,     Epiq     activated     the     Settlement     Website

9

(www.ExicureSecuritiesLitigation.com), which provides investors with access to the Notice, Summary Notice, Long-Form Notice, Proof of Claim form, and important case documents, as well as FAQs and instructions on how to submit claims, opt out from the Settlement, or submit an objection. (*Id.* ¶16.) On October 29, 2024, Epiq began mailing Notices to potential Settlement Class Members, and to date, a total of 8,166 Notices have been mailed or otherwise disseminated to potential Settlement Class Members. (*Id.* ¶¶3-11.)

37.     Pursuant to the Preliminary Approval Order, the deadline for Settlement Class Members to opt out of the Settlement is December 13, 2024, and the deadline for Settlement Class Members to object to the proposed Settlement is December 23, 2024. (*See* ECF No. 103 ¶¶12, 13(a).) To date, Epiq has not received any requests for exclusion or any objections. (Ex. D (Kimball Decl.) ¶¶29, 31.) Lead Counsel will file reply papers by January 6, 2025 to respond to any objections.

## II.     LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND REASONABLE COSTS AND EXPENSES TO LEAD PLAINTIFF

38.     As stated in the Notice and Long-Form Notice, Lead Counsel seeks (i) an award of attorneys' fees of 30% of the Settlement Fund, plus interest at the same rate and for the same period as earned by the Settlement Fund, until paid (the "Fee Application"); and (ii) payment for litigation expenses in the amount of $77,281, plus interest at the same rate and for the same period as earned by the Settlement Fund, until paid (the "Expense Application"). The Notice and Long-Form Notice informed Class Members that Lead Counsel would seek fees up to 30% and reimbursement of expenses up to $110,000, plus interest. (ECF No. 99-2 at 3 of 3; ECF No. 99-3 at 4 & 18 of 31.)

A.      Fee Application

1.      The Time and Labor Expended

39.     Plaintiff's Counsel (Lead Counsel BFA, local counsel Fegan Scott LLC ("Fegan Scott"), and additional counsel The Schall Law Firm ("Schall")) devoted significant time and effort to the prosecution of this Litigation, which totaled 574.9 hours, amounting to $525,862 worth of time and effort.

40.     Specifically, BFA spent 481.7 hours with a total lodestar of $462,912. (*See* Exhibit C.)  This work included, among other things, investigating, drafting, and filing the SAC, conducting related legal research, and participating in a lengthy mediation process, as detailed above, to secure a highly favorable resolution for the Settlement Class.  The time and lodestar for Fegan Scott and Schall are set forth in the declarations attached as Exhibits I and J, respectively; in total, with BFA's time and lodestar set forth in Exhibit C, Plaintiff's Counsel has devoted 574.9 hours and $525,862 in lodestar to prosecuting the Litigation.

41.     Attached as Exhibit B is a list of BFA attorneys and professional support staff who worked on the case, with information about each individual's qualifications, experience, and role.

42.     Attached as Exhibit C is a schedule summarizing the amount of time spent by each attorney and professional support staff employee of BFA from inception of the Litigation through November 30, 2024, the rates applicable to each individual, and a lodestar calculation for each individual.

43.     Exhibit C is based on contemporaneous time records prepared and maintained by BFA in the ordinary course.  As a partner responsible for supervising BFA's work on this case, I supervised the review of these time records to prepare this declaration.  The purpose of this review

11

was to confirm both the accuracy of the time entries and the necessity for, and reasonableness of, the time committed to the Litigation.

44.     As reflected in Exhibit C, the hourly rates for BFA attorneys and professional support staff range from $395 for paralegal support to $1,250 for a founding firm partner.  Current rates are used for current personnel; for attorneys and professional support staff who are no longer employed by BFA, the hourly rate used is the hourly rate for such employee in his or her final year of employment by BFA.

45.     BFA's rates are the usual and customary rates set by BFA for each individual. Different timekeepers within the same employment category (*e.g.*, partner, associate) may have different rates depending on their respective years of experience, years at the firm, years in current position, relevant experience, relevant expertise, and/or rates of similarly situated individuals at BFA or at peer firms.  BFA's rates are comparable to the rates set by peer firms for attorneys and staff of similar skill and experience.

46.     Courts across the country have consistently held that BFA's hourly rates are reasonable.  For instance, the District of Colorado recently approved rates that are identical to the rates applicable here.  *See Bilinsky v. Gatos Silver, Inc.*, No. 1:22-cv-00453-PAB-KAS, ECF Nos. 91-7 & 97 (D. Colo. Oct. 15, 2024); *see also* Settlement Approval Hearing Transcript, *In re Teva Sec. Litig.*, No. 3:17- cv-00558 (SRU) (D. Conn.) (June 2, 2022), 28-29 (granting fee request and accepting BFA's rates); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19-04744 WHA, 2022 WL 816473, at *9 (N.D. Cal. Mar. 17, 2022) ("This order accepts [BFA's] claimed rates as generally tracking the going rate for those with the same levels of skill and experience in our geographic region.").

47. BFA excluded from the lodestar calculations reflected in Exhibit C all time related to the preparation of the Fee and Expense Applications. In the exercise of billing judgment, BFA also eliminated all time from timekeepers with fewer than 10 hours billed to the matter (which amounted to 6.3 hours and $3,445).

48. Exhibit C demonstrates the efficiency of BFA's work. In fact, of the 481.7 hours spent by BFA's seven timekeepers, three attorneys committed 359.7 hours, or approximately 75% of the total. This efficient staffing ensured that knowledge of key information was centralized among a small number of attorneys without duplication of effort.

### 2. The Novelty and Difficulty of the Questions Presented by the Litigation and Counsel's Skills in Representing the Class

49. The difficulties presented by this complex securities class action, and the skill required to successfully navigate them, favor approval of the requested fee award.

50. This was a complex and technical case involving alleged misstatements about scientific data for Exicure's flagship drug, XCUR-FXN. At the outset, BFA was required to learn about, among other things, the complex drug development process; federal regulations governing drug research and data integrity; Exicure's purported "spherical nucleic acid" technology; the rare disease at issue, Friedreich's Ataxia; the nuances of Exicure's purported research and data for XCUR-FXN; and how those facts applied to the alleged violations of securities laws.

51. The SAC reflects Lead Counsel's skill, experience, and investment of extensive work to develop highly technical and scientific allegations. Plaintiff's Counsel leveraged the strength of these allegations to secure a significant recovery for the Settlement Class.

13

### 3. The Result Achieved for the Class

52. The $5.625 million Settlement represents a significant benefit to the Class. It recovers over 22% of maximum estimated damages (of approximately $25 million), more than four times higher than the 4.5% average recovery in Section 10(b) cases between 2014-2023.[3]

53. This exceptional result is especially noteworthy given that Exicure's material financial constraints greatly diminished the prospect of any cash recovery meaningfully larger than the proposed Settlement. With no products or ongoing R&D, Exicure had no significant revenue source and suffered a declining cash position throughout the Litigation. For example, Exicure reported that as of June 30, 2024, it had liabilities exceeding $9 million and a cash balance of just $528,000 and that "there is substantial doubt about the Company's ability to continue as a going concern," such that Exicure "may need to seek bankruptcy protection in the near term."[4] Exicure's tenuous (and worsening) cash position and substantial liabilities raised a serious risk that the Class could not recover more than the $5.625 million Settlement.

### 4. The Risk of Nonpayment and Contingent Nature of Counsel's Fee

54. The requested fee award is also reasonable in light of the significant risks assumed by BFA in prosecuting this complex class action on a fully contingent basis. BFA undertook the representation of the Settlement Class knowing that the Litigation could last for years, would require the substantial investment of time that would otherwise have been devoted to other cases, and provided no guarantee of any compensation. BFA also assumed the risk of advancing all costs

---

[3] *See* Cornerstone Research, *Securities Class Action Settlements – 2023 Review and Analysis*, at 8, *available at* https://www.cornerstone.com/wp-content/uploads/2024/03/Securities-Class-Action-Settlements-2023-Review-and-Analysis.pdf.

[4] *See* Exicure Form 10-Q, dated Aug. 13, 2024, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001698530/000169853024000089/xcur-20240630.htm.

and expenses necessary to successfully prosecute the Litigation with no guarantee of any reimbursement.

55.     In addition to the substantial risks posed by Exicure's distressed financial condition (discussed above), litigating any case under the PSLRA's heightened pleading standards presents risks; more than half (54%) of motions to dismiss securities class actions are granted.[5]   A successful motion could have ended the case and foreclosed any recovery.   Had litigation continued, Defendants would have vigorously disputed scienter.   For example, Defendants Exicure, Giljohann, and Bock likely would have argued that they acted in good faith and without knowledge of the alleged falsity of the XCUR-FXN data or the alleged deficiencies in Exicure's disclosure controls, citing Exicure's internal investigation and its conclusions (ECF No. 61 ¶308), and argued that Defendant Corbett's alleged scienter cannot be imputed to them.

56.     Defendants may also have argued that any alleged misstatements are non-actionable opinions under the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).   These arguments posed substantial risks, including outright dismissal at an early stage.

### 5.     The Experience, Reputation, and Ability of Counsel

57.     BFA partners have litigated dozens of securities actions that have contributed to the recovery of more than $11 billion for investors, including nearly $2 billion since the founding of the firm in 2014.   Securities class actions that BFA has prosecuted and successfully resolved include a $420 million recovery in *In re Teva Securities Litigation*, No. 3:17-cv-0558 (D. Conn.);

---

[5] *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation, 2023 Full-Year Review*, NERA, at 16 (Jan. 23, 2024).

a $234 million recovery in *In re MF Global Holdings Securities Litigation*, No. 11-cv-07866-VM (S.D.N.Y.); a $219 million recovery in *In re Genworth Financial Inc. Securities Litigation*, No. 14-cv-00682-JAG (E.D. Va.); a $129 million recovery in *Greene v. Granite Construction Inc.*, No. 19-cv-04744 (N.D. Cal.); a $120 million recovery in *Freedman v. Weatherford Int'l, Ltd.*, No. 12-cv- 02121-LAK (S.D.N.Y.); and a $21 million recovery in *Bilinsky v. Gatos Silver, Inc.*, No. 1:22-cv-00453-PAB-KAS (D. Colo.).

58.     BFA also serves as lead counsel in a number of significant pending securities class actions around the country, including *Lozada v. TaskUs, Inc.*, No. 22-cv-01479 (S.D.N.Y.); *Peters v. Twist Bioscience Corp.*, No. 22-cv-08168 (N.D. Cal.); *In re Talis Biomedical Securities Litigation*, No. 22-cv-00105 (N.D. Cal.) (settlement pending); *Chow v. Enochian Biosciences Inc.*, No. 22-cv-01374 (C.D. Cal.) (settlement pending); and *Ciarciello v. Bioventus Inc.*, No. 23-cv-00032 (M.D.N.C.) (settlement pending).

### 6.     The Reaction of the Lead Plaintiff and Class Supports the Fee Application

59.     Lead Plaintiff supports the fee request, which is consistent with his retention agreement with counsel.  (Ex. A (Mathew Decl.) ¶¶9-11.)  Lead Plaintiff's support and *ex ante* agreement regarding the fee request weighs heavily in favor of approval of the requested fee.

60.     The reaction of the Settlement Class to the proposed Settlement, including the fee request, further supports approval.  To date, no Settlement Class Members have objected to the fee request or sought exclusion from the Settlement.

**B.     Expense Application**

**1.     BFA's Litigation Expenses**

61.     BFA respectfully requests $77,281 in litigation expenses that it incurred in the prosecution of the Action.  BFA incurred these expenses with full knowledge that it might not recover any of them if the litigation was not successful.

62.     Given the fully contingent representation and the risks of litigation, BFA was incentivized to prosecute this Action as efficiently as possible while achieving the best possible result.  Notably, the requested amount of expenses is substantially lower than the maximum amount of $110,000 estimated in the Notice disseminated to the Class.  To date, no Settlement Class Member has objected to the maximum amount of expenses set forth in the Notice, confirming the reasonableness of the requested expenses.

63.     Attached as Exhibit G is a summary of BFA's expenses incurred in connection with the prosecution of the Litigation.  Exhibit G identifies each category of expense and the amount incurred in each category.

64.     Exhibit G and this Declaration are based on information maintained contemporaneously and in the ordinary course by BFA, including receipts, invoices, expense vouchers, check records, and similar documents.  I have reviewed Exhibit G and believe it to be an accurate record of the expenses incurred by BFA related to this matter.

65.     The expenses set forth in Exhibit G consist primarily (but not exclusively) of the following costs and expenses:[6]

---

[6] As noted in Exhibit G, additional expenses were incurred for accommodations, and local and out-of-town transportation.

17

- Expert Fees: $32,206. This category includes the fees for Peregrine and Global Economics Group to analyze damages in connection with the mediation.

- Litigation Support Vendor Fees: $11,208. This category includes fees for a vendor who provided investigative services in connection with the SAC.

- Mediation Fees: $28,160. This category includes the fees borne by BFA to retain the services of Jed Melnick of JAMS for mediation.

- Service & Filing Fees: $300. This category includes Court filing fees and fees for *pro hac vice* admissions.

- Transfer List: $4,483. This category consists of reimbursing Exicure for 50% of the cost of the transfer list (necessary to identify potential Settlement Class Members and disseminate notice).

- Computer Research: $286. This category includes vendors such as PACER and Thomson Reuters, used to obtain access to legal research and factual databases.

### 2. Lead Plaintiff's Reasonable Costs and Expenses

66. Lead Plaintiff James Mathew also seeks an award, pursuant to 15 U.S.C. § 78u-4(a)(4), of his costs and expenses directly related to his representation of the Class. As detailed in the Mathew Declaration (Exhibit A), based on Mr. Mathew's time devoted to this Action, he seeks an award of $6,000, equal to the amount that the Notice advised the Settlement Class could be requested.

67. I respectfully submit that this award is consistent with Congress's intent, as expressed in the PSLRA, of encouraging investors to take active roles in supervising securities

18

actions.  As set forth in his declaration, Mr. Mathew has been committed to pursuing this Action

and diligently and effectively fulfilled his obligations as a representative plaintiff.

Dated: December 9, 2024

/s/ Evan A. Kubota
Evan A. Kubota

19